AMY J. LONGO, Cal. Bar No. 198304
Email: longoa@sec.gov
PETER DEL GRECO (Cal. Bar No. 164925)
Email: delgrecop@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>DANIEL MARKEL,<br><br>Defendant. | Case No. 2:20-cv-00502<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a).

2. Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of

COMPLAINT 1

business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because defendant Daniel Markel resides in this district.

## SUMMARY

4. This matter concerns the omission of material information by Daniel Markel, the principal and founder of Sobriety & Addiction Solutions LLC dba MyLife Recovery Centers ("MyLife"), from the purchasers of MyLife's securities.

5. From 2013 to 2016, Markel raised more than $7.7 million from more than 100 investors nationwide in an unregistered offering of MyLife's securities.

6. In a private placement memorandum ("PPM") and other promotional materials, Markel promoted MyLife as having an exclusive license to use a subcutaneous implant of Naltrexone (the "Implant") to treat alcohol and opioid dependencies, and emphasized the success that MyLife had attained from its use of the Implant.

7. Markel failed to disclose to investors that, from March 2015 to at least March 2016, MyLife was using Implants that had been compounded in and exported from China, in violation of certain Food and Drug Administration ("FDA") regulations. The omission of this information rendered prior representations Markel made to investors regarding the viability of MyLife's business model materially misleading.

8. Markel acted with negligence by failing to disclose this material fact to investors, thus violating Sections 17(a)(2) and 17(a)(3) of the Securities Act.

9. Markel also failed to register MyLife's offering of its securities, and no exemption from the registration requirements applied. Consequently, Markel violated the securities registration provisions of Sections 5(a) and 5(c) of the Securities Act.

10. During the time period of the offering, Markel was paid $439,678 in commissions through his then-registered, but now defunct, broker-dealer, DT Securities, Ltd., which Markel solely owned.

11. With this action, the SEC seeks a permanent injunction, disgorgement of ill-gotten gains with prejudgment interest, and a civil penalty against Markel.

## THE DEFENDANT

12. **Daniel Markel,** age 55, Central Registration Depository ("CRD") No. 4001466, was the founder of MyLife and was its CEO until his resignation in September 2016. He is a resident of Toluca Lake, California.

## RELATED PARTIES

13. **Sobriety & Addiction Solutions, LLC dba MyLife Recovery Centers (f/k/a Fresh Start NoCal, LLC)** was a California limited liability company located in Toluca Lake, California. MyLife is now defunct.

14. **DT Securities Ltd. (f/k/a Markel Newton)**, CRD No. 131662, was the broker-dealer firm that Markel used to conduct the offerings for MyLife. It was expelled from FINRA membership in 2016.

## THE ALLEGATIONS

**A. The Use of Implants Was Central to MyLife's Business Plan**

15. Markel commenced the offering of MyLife securities in the form of membership interests, or "units," in 2013.

16. According to its PPM, which Markel created, MyLife was formed "to own, operate, and otherwise maintain facilities for the treatment of people afflicted with alcoholism." MyLife's mission expanded to address opioid addiction as well.

17. The PPM stated that MyLife effected patient treatment through a "minimally invasive outpatient procedure involving the Naltrexone Implant, pursuant to an exclusive license and distribution agreement" between MyLife and the licensor of the Implant.

18. Naltrexone is a medication that blocks the effects of opioids. It is used in

the treatment of alcohol and opioid dependency.

19. Although the FDA approved the use of Naltrexone in oral form in 2006, it has never approved the use of Naltrexone in the form of a subcutaneous implant.

20. MyLife claimed that its exclusive right to use a time-release Implant which administered Naltrexone via pill or injection set it apart from its competitors, because the Implant did not rely on often unreliable patients to be responsible for taking the medication or scheduling the injection appointment.

21. MyLife contracted with physicians to evaluate a prospective patient's suitability for treatment and to conduct the Implant procedure itself.

22. MyLife stated that use of the Implant would represent substantially all of its total projected revenues.

**B.     MyLife Used Implants Compounded in Violation of FDA Regulations**

23. MyLife used Implants that it purchased from third parties.

24. Notwithstanding the fact that the Implants MyLife purchased from third parties were not FDA-approved, MyLife relied on an exception to FDA regulations known as "off-label use."

25. The FDA defines off-label use as a "use parameter not mentioned in the approved labeling." That is, the FDA permits physicians to prescribe, on an individualized basis, approved medications for other than their intended indications.

26. In order to qualify as permissible off-label use, the Implants used by MyLife had to have been prescribed by a licensed physician and sourced from either a domestic compounding pharmacy or an overseas maker that was particularly approved as a Good Manufacturing Practices ("GMP") facility by the FDA.

27. "Compounding" refers to the creation of a pharmaceutical product from the combination of appropriate ingredients, to fit the unique needs of a patient.

28. On at least five occasions between March 2015 and March 2016, Markel imported Implants compounded in Hong Kong (the "Chinese Implants") by a pharmaceutical manufacturing company that was not approved as a GMP facility by the

1  FDA.

2  29. Markel oversaw the distribution of the Chinese Implants to affiliated
3  medical clinics, where they were implanted into MyLife patients.

4  **C.  Markel Omitted Material Information from MyLife Investors**

5  30. Markel should have known that MyLife was importing and using Implants
6  that were sourced in violation of FDA regulations and he acted with negligence by
7  failing to disclose this fact to investors.

8  31. Markel should have known of the existential risk that MyLife's reliance on
9  and use of the Chinese Implants posed to its business plan, its future prospects, and the
10 value of its securities, and he acted with negligence by failing to disclose this risk to
11 investors.

12 **D.  Markel Received Commissions on the Sale of MyLife's Securities**

13 32. During the offering period of MyLife's securities, Markel owned and
14 operated DT Securities Ltd., a registered broker-dealer.

15 33. DT Securities Ltd. acted as broker-dealer on the sale of MyLife's securities
16 and received $439,678 in commissions for its role in that capacity.

17 **E.  Registration Violations**

18 34. MyLife raised more than $7.7 million from more than 100 investors
19 nationwide.

20 35. Markel was a necessary participant in, and played a substantial role in, the
21 offer and sale of MyLife's securities. He participated in the creation of the PPM that
22 was sent to prospective investors. His solely-owned broker-dealer, DT Securities Ltd.,
23 acted as broker-dealer on the MyLife offering, and was paid commissions for doing so.
24 Many of MyLife's investors were investors in other business ventures of Markel, or
25 were referred to him by investors in his other business ventures.

26 36. MyLife's securities offering was never registered with the Commission,
27 and no valid exemption from registration existed.

28 37. Although investors were required to sign a self-accreditation form in which

1 they attested that they were accredited investors, neither Markel nor DT Securities performed any further due diligence as to the attested accreditation of MyLife's investors.

38. Several MyLife investors were unaccredited and/or were not sophisticated investors.

## FIRST CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violation of Sections 17(a)(2) of the Securities Act

39. The SEC realleges and incorporates by reference paragraphs 1 through 38 above.

40. As alleged above in paragraphs 4 through 33, among other allegations, Markel failed to provide MyLife investors with certain material facts, including the fact that its Chinese Implants were not sourced in accordance with FDA regulations. This omission made prior statements Markel had made to investors regarding MyLife's financial viability misleading.

41. Markel obtained money in the form of commissions paid to DT Securities by means of the material omissions regarding the origins of the Chinese Implants.

42. By engaging in the conduct described above, Markel, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, with scienter or negligently, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

43. By engaging in the conduct described above, Markel violated, and unless enjoined is reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## SECOND CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violation of Sections 17(a)(3) of the Securities Act**

44. The SEC realleges and incorporates by reference paragraphs 1 through 38 above.

45. As alleged above in paragraphs 4 through 33, among other allegations, in the course of its sale of securities, Markel and MyLife failed to disclosedisclose that its Chinese Implants were not sourced in accordance with FDA regulations. This omission made prior statements Markel had made to investors regarding MyLife's financial viability misleading.

46. By engaging in the conduct described above, Markel, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, with scienter or negligently, engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

47. By engaging in the conduct described above, Markel violated, and unless enjoined is reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## THIRD CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities**

**Violation of Sections 5(a) and 5(c) of the Securities Act**

48. The SEC realleges and incorporates by reference paragraphs 1 through 38 above.

49. As alleged above in paragraphs 34 through 38, among other allegations, Markel, directly or indirectly, offered and sold securities of MyLife in an offering or offerings that were not registered with the SEC and that were not subject to a valid exemption from registration.

50. By engaging in the conduct described above, Markel, directly or indirectly,

singly and in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

51. By engaging in the conduct described above, Markel violated, and unless enjoined is reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Defendant Markel committed the alleged violations.

**II.**

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Markel, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§77q(a)(2) and 77q(a)(3)].

**III.**

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Markel, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & 77e(c)].

**IV.**

Order Defendant Markel to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon.

**V.**

Order Defendant Markel to pay a civil penalty under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: January 16, 2020                    */s/ Peter Del Greco*
                                           Peter Del Greco
                                           Attorney for Plaintiff
                                           Securities and Exchange Commission